NELLY RIOS, Individually and as Legal Representative of JUAN V. RIOS, et al., Respondents, v ALTAMONT FARMS, INC., Appellant. (And Eight Other Actions.)

Third Department, April 12, 1984

.APPEARANCES OF COUNSEL

*Rusk, Rusk, Plunket & Wadlin* and *Charles, Karalekas, McCahill & Wilson* (*S. Steven Karalekas* of counsel), for appellant.

*Howard Schell Reilly* and *Thomas A. Harnett* (*Gretchen Coll-Marti* of counsel), for respondents.

### OPINION OF THE COURT

KANE, J.

Plaintiffs, Puerto Rican migrant farm workers and members of their families, seek in these actions to enforce default judgments entered in Puerto Rico against defendants, who are apple growers located in New York State. The Puerto Rican default judgments grew out of the 1978 apple harvest season in New York. In the spring of that

year, as in prior years, the apple growers in question applied to the Federal Government for permission to employ temporary foreign labor to harvest their apples. Consequently, the background of this case involves the interaction of two Federal statutes, the Wagner-Peyser Act (US Code, tit 29, § 49 *et seq.*) and the Immigration and Nationality Act of 1952 (US Code, tit 8, § 1101 *et seq.*).

The Wagner-Peyser Act, among other things, established the United States Employment Services "[i]n order to promote the establishment and maintenance of a national system of public employment offices" (US Code, tit 29, § 49). Pursuant to the authority conferred by the Wagner-Peyser Act, the United States Secretary of Labor has established an interstate clearance system to "provide employers a means of recruiting nonlocal workers, when the supply of local workers is inadequate" (*Snapp & Son v Puerto Rico,* 458 US 592, 595; see, also, 20 CFR 602.1 [c]). If local workers are not available, a "clearance order" is sent through the Employment and Training Administration of the Department of Labor to other State labor agencies in order to give them an opportunity to meet the request.

As detailed by the United States Supreme Court in *Snapp & Son v Puerto Rico (supra),* some of defendants' obligations under the Wagner-Peyser Act come from the Immigration and Nationality Act which regulates the admission of nonimmigrant aliens into the United States. This act authorizes the admission of temporary foreign workers into this country only "if unemployed persons capable of performing such service or labor cannot be found in this country" (US Code, tit 8, § 1101, subd [a], par [15], cl [H], subcl [ii]). The initial responsibility for determining whether enough qualified United States workers are available to fill a need is vested with the United States Secretary of Labor (see *Snapp & Son v Puerto Rico, supra,* p 595).

Defendants, who desired to employ temporary foreign agricultural laborers, were, therefore, required to initially seek domestic workers through the interstate clearance system. Defendants were thus directed to file an application with the local (Kingston) office of the New York State Employment Service, together with a sample job offer (20 CFR 655.201 [a] [1]; [b] [1]). According to regulation, a

local office which receives a job order first attempts to recruit workers in the local labor market (20 CFR 653.501 [d] [7]).[1] In the event sufficient local workers cannot be recruited, the local office places the job order into the *intrastate* clearance system for recruitment of workers throughout the State (20 CFR 653.501 [d] [7]; [e] [2]). If the State agency is also unable to recruit sufficient workers within the State, that agency places the job order into the *interstate* clearance system for circulation to areas of the country where there exists an oversupply of the needed workers (20 CFR 653.501 [e] [2]). The United States Department of Labor determines the areas of supply to which job orders will be sent (20 CFR 653.501 [e] [3]). This is also true in regard to clearance orders submitted in connection with applications for temporary foreign workers (20 CFR 655.205 [a]). In the instant case, the orders were sent to several States and Puerto Rico,[2] and the Puerto Rican Department of Labor recruited persons to work defendants' farm.

The clearance orders sent by defendants and the circumstances surrounding the recruitment of workers were apparently all the same.[3] In this regard, the clearance order sent by defendant Altamont Farms, Inc., dealing with referral instructions, stated "Bill Paladino, 914 795-2171" was the person to contact, and the clearance order stated that collect calls would be accepted "only from officials of Employment Service Offices". It is uncontroverted that at no time did either a Puerto Rican worker or the Puerto Rican Department of Labor contact defendant Altamont. Indeed, the testimony of Manuel Rodriguez Escalera, the Associate Director of the Immigration Division of the Com-

1. This regulation was contained in 20 CFR 653.108 in 1978.

2. As used in the Wagner-Peyser Act, the word "State" includes Puerto Rico (US Code, tit 29, § 49a, subd [5]). It should be noted, however, that when defendant Altamont Farms, Inc., submitted its clearance order in March, 1978, it was informed that said order would not be submitted to Puerto Rico. In August, 1978, when certain statutory problems were resolved, the clearance order was submitted to Puerto Rico.

3. Although the record does not contain the clearance orders sent by each defendant, all parties refer to the clearance order sent by defendant Altamont and the recruitment of workers as an example of the facts involving all defendants. It should also be noted that the various actions were consolidated upon plaintiffs' cross motion. This cross motion was made subsequent to defendant Altamont's motion for summary judgment in *Rios v Altamont Farms*. In their motion to consolidate, plaintiffs, who are all represented by the same attorney's office, assert that all cases present the same legal issue as to jurisdiction.

monwealth of Puerto Rico Department of Labor, indicates that Puerto Rican workers were recruited *without* the growers being contacted. Moreover, at *no time* did Altamont execute a "Designation of Hiring Agent" (US Department of Labor — Form ES-569), authorizing either the Department of Labor or the Puerto Rican Department of Labor to act as its agent for the purposes of hiring.

Subsequently, defendant Altamont was informed that its request for temporary labor certification was being denied in part because a number of Puerto Ricans had accepted its clearance order. Certain Puerto Rican workers then arrived at defendant Altamont's orchards. Thereafter, however, problems apparently developed and many of the workers returned home. Plaintiffs, the returned workers, together with members of their families in some cases, then commenced the underlying actions in the Superior Courts of Puerto Rico against defendant Altamont and other apple growers and were awarded default judgments for breach of contract and tort claims arising out of the 1978 harvest season. In the present New York State actions, plaintiffs seek to enforce those judgments. Defendant Altamont moved for summary judgment dismissing the action commenced against it upon the ground that the underlying default judgment was void because the Puerto Rican court lacked personal jurisdiction over it. Plaintiffs then cross-moved to consolidate *Rios v Altamont Farms* with the subject eight other actions and for summary judgment against all defendants. Special Term consolidated all actions, and after concluding that Puerto Rico properly asserted jurisdiction over all defendants, granted summary judgment in favor of plaintiffs. This appeal by defendants ensued.

The Puerto Rican judgments must be given full faith and credit in the courts of New York (*Americana of Puerto Rico v Kaplus,* 368 F2d 431, 437, cert den 386 US 943) unless the Puerto Rican courts failed to acquire personal jurisdiction over defendants (*Durfee v Duke,* 375 US 106, 109). Although a judgment may be collaterally attacked because jurisdiction was not proper under the statutes of the forum State (*Hunt v Dawson County, Montana,* 623 F2d 621), in this case, the Puerto Rican judgments are valid so long as

due process is satisfied because Puerto Rico extends its jurisdiction (Laws of Puerto Rico Ann, tit 32, Appendix II, Rules of Civ Pro, rule 4.7) to the fullest extent permitted by the due process clause (*Integrated Inds. v Continental Milling Co.*, 385 F Supp 883; *Ramon Vela, Inc. v Sagner, Inc.*, 382 F Supp 478). Accordingly, the issue presented on appeal is whether defendants' clearance orders provided sufficient contacts with Puerto Rico to enable the Puerto Rican courts to assert jurisdiction consistent with the due process clause of the United States Constitution.

In order to maintain fairness and interstate federalism (see Braveman, Interstate Federalism and Personal Jurisdiction, 33 Syracuse L Rev 533), due process only permits a State court to render a valid personal judgment against a nonresident defendant if that defendant has sufficient minimum contacts which make subjecting defendant to a suit in that State consistent with " 'traditional notions of fair play and substantial justice' " (*International Shoe Co. v Washington,* 326 US 310, 316, quoting *Milliken v Meyer,* 311 US 457, 463). These contacts must be the result of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" (*Hanson v Denckla,* 357 US 235, 253). This rule "is not susceptible of mechanical application; rather, *the facts of each case must be weighed*" (*Kulko v California Superior Ct.,* 436 US 84, 92; emphasis added). The factors to be considered in this analysis include: "the burden on the defendant * * * the forum State's interest in adjudicating the dispute * * * the plaintiff's interest in obtaining convenient and effective relief * * * the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of several States in furthering fundamental substantive social policies" (*World-Wide Volkswagen Corp. v Woodson,* 444 US 286, 292).

It appears from the record that defendant apple growers had *no* contact with the Commonwealth of Puerto Rico other than the fact that their clearance orders, which they had filed with their local employment offices in this State, were forwarded to Puerto Rico at the direction of the

United States Department of Labor. In our opinion, such contact is insufficient to enable the Puerto Rican courts to assert jurisdiction consistent with the due process clause. Contrary to plaintiffs' assertion, we fail to find that the forwarding of defendants' clearance orders to Puerto Rico by the United States Department of Labor was an activity of defendants by which they purposefully availed themselves of the privilege of conducting activities within Puerto Rico, thus invoking the benefits and protections of Puerto Rican law. As detailed above, the clearance order was not sent to Puerto Rico at the request of defendants. In fact, it is uncontroverted that defendants' desire was to secure permission to employ temporary *foreign workers*. In this regard, they filed applications for temporary foreign labor certification with the *local office* of the New York State Employment Service. If the local office had located sufficient qualified workers, the clearance orders would not have been sent to Puerto Rico by the United States Labor Department. Indeed, it was not the decision of defendants to forward the clearance orders to Puerto Rico, but rather, was the decision of the United States Department of Labor. Moreover, defendants took no action in Puerto Rico with respect to the clearance orders. As discussed previously, there was no contact between the Puerto Rican workers and defendants until the workers arrived in New York. In sum, it is this court's opinion that the fortuitous nature of defendants' sole contact with Puerto Rico is insufficient to satisfy the requirements of due process.

*Neizil v Williams* (543 F Supp 899), *Garcia v Vasquez* (524 F Supp 40) and *Acker v Hepburn Orchards* (US Dist Ct, MD Fla, Nov. 29, 1982, Castagana, J.) are factually distinguishable from the present case, for the more intensive and direct recruitment efforts by defendants in those cases provided some evidence that defendants therein purposefully availed themselves of the privilege of conducting activities within the forum State.

That portion of plaintiffs' cross motion seeking summary judgment should, therefore, have been denied and summary judgment should have been granted in favor of all defendants dismissing the complaints.

The order and judgment should be modified, on the law, by reversing so much thereof as granted plaintiffs' cross motion for summary judgment; the cross motion for summary judgment should be denied and summary judgment awarded to defendants dismissing the complaints; and, as so modified, affirmed, without costs.

LEVINE, J. (dissenting). As I read the majority's decision, reliance is placed on three basic points to support a holding that due process was violated when the Puerto Rican courts asserted in personam jurisdiction over defendants in adjudicating plaintiffs' claims: (1) that defendants did nothing beyond the single isolated act of filing clearance orders in their local State employment offices; the transmittal of the clearance orders to Puerto Rico was purely a result of the operation of the Federal bureaucratic machinery and, hence, was involuntary as to defendants; (2) that the recruitment of farm laborers in Puerto Rico was not for defendants' benefit because, actually, they wanted to recruit Jamaican workers; and (3) that the activities of Puerto Rican Labor Department officials in recruiting workers cannot be attributed to defendants because they did not execute a designation of hiring authority for the Puerto Rican Labor Department to act as their agent for purposes of hiring. These grounds either fail to fully reflect all of the facts contained in the record or are irrelevant for purposes of determining whether due process was violated here.

The record establishes the following uncontested facts: defendants, all members of a regional apple growers' association, desired to recruit Jamaican workers to pick apples for the fall, 1978 harvest. However, under the Wagner-Peyser Act (US Code, tit 29, § 49 *et seq.*) and the Immigration and Nationality Act of 1952 (US Code, tit 8, § 1101 *et seq.*), this could not be accomplished without first giving available workers in certain regions of high unemployment in the United States and its territories an opportunity to fill all openings through the procedures of the interstate clearance system. This entailed defendants filing clearance orders with their local State employment offices for transmittal to similar local offices in the designated regions. The orders signed by defendants expressly

listed "Federal Region II", which included New York, Puerto Rico and the Virgin Islands, as among the regions targeted for such distribution. Although perhaps defendants were led to understand that Puerto Rico was not a region included for distribution of their clearance orders when they initially filed them in March, 1978, the record uncontestably establishes that they were made aware that the job orders were physically delivered to Puerto Rican employment offices in early August, 1978, still well before the date harvesting was to commence in September. Defendants were kept informed of the progress of recruitment in Puerto Rico and, at one point, were told that because of the success of those efforts, their request for authorization to hire alien workers was denied.

Moreover, also in August, 1978, defendants participated through their growers' association in a suit in the Federal District Court to compel the United States Labor Department and Immigration Service to permit recruitment of foreign workers. In that action, they specifically assured the court that if the ban on foreign workers was lifted, they would still give priority to available Puerto Rican workers. Once defendants' clearance orders reached Puerto Rico, the following activities took place: first the Commonwealth employment service widely publicized the job offers and recruited workers for over 2,000 harvesting positions in New York and elsewhere. Responding Puerto Rican farm laborers were then screened in two respects, i.e., their commitment to accepting the positions and their suitability, which entailed requiring applicants to submit certificates of good health and of lack of a criminal record. It is also an uncontested fact that the procurement and screening process continued throughout the month of August, 1978. During the course of the recruitment and screening process, defendants were advised of the numbers and names of workers whom they should expect to arrive to fill the requested positions. Services were also provided to expedite their embarkation by plane to the United States. Shortly after arriving at defendants' orchards in early September, however, the recruited workers were discharged. This happened to coincide with the successful conclusion of defendants' Federal action seeking relief

from restrictions on their hiring Jamaican laborers. Plaintiffs then brought the lawsuits in Puerto Rico which are the subject of this appeal, the gravamen of which were for breach of contract. The judgments plaintiffs seek to enforce here granted each plaintiff direct and consequential damages for such breach of contract.

It is upon the totality of the foregoing facts and not selective elements thereof that the due process issue must be determined. As the majority correctly notes, the basic test deciding whether a forum State can exercise extraterritorial in personam jurisdiction is derived from the test set forth in *International Shoe Co. v Washington* (326 US 310, 316) that due process requires sufficient "minimum contacts" which make subjecting defendant to a suit in that State consistent with "traditional notions of fair play and substantial justice". Subsequent cases make clear that each of the two parts of the test are independently significant and must be weighed and balanced (see, generally, *World-Wide Volkswagen Corp. v Woodson,* 444 US 286, 291-294).

The minimum contacts element of the test primarily centers on whether a defendant engaged in activities in the forum State by virtue of which he "purposely" availed himself of the benefits and protection of the laws of that State (*World-Wide Volkswagen Corp. v Woodson, supra,* p 295; *Hanson v Denckla,* 357 US 235, 253). It is now settled, however, that the requisite minimum contacts can be established without the defendant having ever physically entered or acted in the forum State; the test can be satisfied solely through a defendant's *communications* to that State (*McGee v International Life Ins. Co.,* 355 US 220, 222-223; see, also, *Parke-Bernet Galleries v Franklyn,* 26 NY2d 13). The minimum contacts requirement is also significantly more easily met when the suit arises out of the very activities brought about by the defendant in the forum State (see *McGee v International Life Ins. Co., supra,* p 223; *International Shoe Co. v Washington, supra,* p 321; *Thompson v Ecological Science Corp.,* 421 F2d 467, 470). As applied to contract litigation, such as the cases at bar, it has been held that due process is satisfied if the suit arises out of a contract which had a "substantial connection" with

the forum State (*McGee v International Life Ins. Co., supra,* p 223). A State's power to assert jurisdiction in contract cases is not dependent on conceptualistic rules concerning the place of contracting or of performance (*Travelers Health Assn. v Virginia,* 339 US 643, 648). Our own courts, applying this criterion in the converse situation where New York claimed the right to adjudicate contract claims against nonresidents, have examined the *entire* transaction involving the contract and have found sufficient "substantial connection" on the basis of events in New York *preliminary or subsequent* to its execution (*Longines-Wittnauer Watch Co. v Barnes & Reinecke,* 15 NY2d 443, 457, cert den *sub nom. Estwing Mfg. Co. v Singer,* 382 US 905; *Lynch v Austin,* 96 AD2d 196; *Collateral Factors Corp. v Meyers,* 39 AD2d 27, 29).

The second facet of the *International Shoe Co.* test, i.e., whether maintenance of the suit offends notions of fair play and substantial justice, deals with equity and policy considerations. It requires inquiry directed toward the relative burdens placed upon the plaintiff and defendant if each were compelled to litigate their dispute in the other party's home jurisdiction and whether the forum State has a legitimate interest in adjudicating the dispute (*World-Wide Volkswagen Corp. v Woodson, supra,* p 292).

Measured by all of the foregoing criteria, I have no difficulty in finding that defendants' activities constituted sufficient minimum contacts with Puerto Rico to subject them to breach of contract suits there, completely consistent with fair play and substantial justice. To begin with, defendants' clearance orders represented formal offers to contract with responding workers, containing all the essential terms and conditions of employment, including rates of pay, the date work was to begin and even provisions for financing transportation of the workers from the place of recruitment to the work sites. The orders, signed by each defendant, state "THIS JOB OFFER DESCRIBES THE ACTUAL TERMS AND CONDITIONS OF THE EMPLOYMENT *BEING OFFERED BY ME* AND CONTAINS ALL OF THE MATERIAL TERMS AND CONDITIONS OF THE JOB" (emphasis added). Clearance orders have been so construed by the Federal courts (*Aguero v Christopher,* 481 F Supp 1272, 1274; *Aguero v Usery,* US Dist Ct, SD Tex, May 2, 1976, Garza, J.).

There can be no question whatsoever that in filing the orders in local New York State employment offices, defendants deliberately set in motion the job recruitment machinery of the interstate clearance system. Thus, defendants did not merely acquiesce in the transmission of the clearance orders to other States and territories; each of them purposefully sent into the stream of interstate commerce a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers. Defendants were also well aware that their clearance orders reached Puerto Rico and were being acted upon there. They received communications concerning the progress of recruitment which must have originated from Puerto Rican labor officials and, as previously noted, in their Federal action to gain entry of Jamaican workers, they assured the court that they would respond favorably to recruitment efforts in Puerto Rico.

The record equally belies any contention that the activities of the Puerto Rican Labor Department were not for defendants' benefit. If, as the majority suggests, defendants' ulterior motive here was always to circumvent requirements of the Federal Immigration and Nationality Act so as to be able to recruit Jamaicans, the plain and unavoidable fact is that *the recruitment process in Puerto Rico had to take place in order for defendants to accomplish their ultimate objective.* This alone, in my view, dispels any inference that the recruitment process was not at least partially for the benefit and at the behest of these defendants. Indeed, certain of the activities performed by Puerto Rican governmental authorities were *exclusively* for defendants' benefit. The screening of laborers' health and police records can hardly be considered to have been in the interest of anyone but defendants. Likewise, under the terms of the clearance orders defendants were liable for the workers' transportation expenses, to be paid either by advancing funds or reimbursing amounts spent by the workers or the Puerto Rican Government for that purpose. Therefore, when government agents arranged transportation, they aided defendants in discharging that contractual obligation.

The activities defendants thus engendered were more than sufficient to satisfy the basic minimum contacts criteria of *International Shoe Co.* (326 US 310, *supra*). For their own commercial self-interest, defendants elected to import migrant workers through the channels of interstate commerce. They further elected to take advantage of the expense-free hiring procedures of the interstate clearance system. These purposeful acts were undertaken with certain awareness that job offers would be disseminated and acted upon in Puerto Rico. They availed themselves of recruitment, screening and logistical services created under Puerto Rican laws and performed by Commonwealth employees. The conclusion is, therefore, inescapable that defendants purposefully and knowingly availed themselves of the benefits and protections established by Puerto Rican law. Nor can this conclusion be avoided by stressing that defendants never signed designations of hiring authority. No formal agency relationship is required in order to hold defendants responsible for the acts of others on their behalf which they initiated through their communications (see *Parke-Bernet Galleries v Franklyn,* 26 NY2d 13, 18, *supra*).

Examination of the entire transaction involving the employment contracts on which plaintiffs' suits are based also demonstrates the existence of a "substantial connection" with the forum State sufficient to satisfy due process. The offers to contract were physically delivered and distributed in Puerto Rico. Arguably, the offers were accepted there when plaintiffs made commitments to fill the harvesting positions, so that formation of the contracts was completed in Puerto Rico. At the least, significant preliminary steps leading to contract formation took place in Puerto Rico, including the performance of various conditions that defendants stipulated for in the clearance orders. These preliminary steps, including the making of commitments, obtaining medical and police clearances, advancing the costs of air transport and actual embarkation, constituted either part performance or foreseeable detrimental action in reliance so as to have made defendants' offers irrevocable and legally binding before any plaintiff set foot in New York (see 1 Corbin, Contracts, §§ 49, 51). Puerto

Rico's substantial connection with the contracts of employment out of which plaintiffs' suits arose was far greater here than that presented in *McGee v International Life Ins. Co.* (355 US 220, *supra*). In *McGee,* a Texas insurer mailed to a California resident a single offer to continue life insurance coverage. The insured responded by mailing premiums from California to Texas. The Supreme Court held that those communications alone sufficiently connected California to the contract of insurance to permit the California courts to exercise personal jurisdiction over the insurer in a suit on the policy. Here, job offers were delivered to Puerto Rico and extensively communicated through the media there. The response to the job offers in Puerto Rico by plaintiffs and governmental agents in terms of expenditure of time, effort and money need not be repeated. *McGee* should, therefore, be a fortiori controlling.

Plaintiffs' case for valid jurisdiction is even more easily made when it is considered in terms of its consistency with traditional notions of fair play and substantial justice, the balance of the *International Shoe Co.* test. Indeed, on the basis of comparing the relative burdens of litigation in a foreign jurisdiction and assessing the forum State's interest in the litigation, it more aptly might be said that fair play and justice *demand* that plaintiffs be permitted validly to litigate their claims in their home forum. Plaintiffs here are impoverished, English-illiterate farm workers. Economic and logistical realities render them totally incapable of obtaining legal redress for their complaints in the courts of New York. Defendants, on the other hand, are ongoing business entities. They have already demonstrated their willingness to act collectively and share the costs of litigation in the Federal courts, as well as in the New York courts in the matter now before us. It may reasonably be assumed that the common defense to all of the claims asserted by these plaintiffs would basically entail testimony from a few supervisory employees concerning defendants' justification for discharging plaintiffs. Imposing the burden of producing such witnesses in Puerto Rico hardly amounts to a denial of due process, when a converse ruling effectively would confer total immunity from suit upon defendants (see *McGee v International Life*

*Ins. Co.,* 355 US 220, 223-224, *supra; Travelers Health Assn. v Virginia,* 339 US 643, 648-649, *supra*). The manifest and legitimate interest of Puerto Rico in obtaining redress for its citizens and protecting their contractual rights is also clear. That interest has already been recognized by the United States Supreme Court as being sufficient to give the Commonwealth independent standing to sue in the Federal court on behalf of its workers on related claims (*Snapp & Son v Puerto Rico,* 458 US 592).

For all of the foregoing reasons, I vote in favor of upholding the jurisdiction of the only forum where these plaintiffs can obtain a just determination of their causes — the courts of the Commonwealth of Puerto Rico.

MAHONEY, P. J., CASEY and WEISS, JJ., concur with KANE, J.; LEVINE, J., dissents in an opinion.

Order and judgment modified, on the law, by reversing so much thereof as granted plaintiffs' cross motion for summary judgment; cross motion for summary judgment denied and summary judgment awarded to defendants dismissing the complaints; and, as so modified, affirmed, without costs.