[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The facts of this case, jointly stipulated to by both parties are as follows: . . . .
In 1991, the defendant, O.J. Thrall, Inc. ["Thrall"], a Connecticut corporation engaged in the planting, cultivation, and harvesting of shade tobacco, placed a clearance order with the DOL at Boston Regional Office and the Connecticut Department of Labor ["Hartford Job Service"] pursuant to the CT Page 4340 Wagner-Peyser Act for the recruitment and referral of workers for its farm. Thrall sought to hire temporary foreign agricultural workers for the upcoming tobacco season, in anticipation that its hiring needs for the season would not be filled by the local labor market.
Pursuant to the Wagner-Peyser Act, Thrall completed Form ETA-795, the clearance order, detailing the period of employment from June 10, 1991 to September 10, 1991 at a flat wage rate of $5.21 per hour. . . . The Department of Labor in Puerto Rico recruited fifty-one persons, including the plaintiffs, Elvin and Edward Negron Nazario, who are residents of Yauco, Puerto Rico, to fulfill the order. . . .
On June 5, 1991, the Puerto Rican Department of Labor faxed a letter of confirmation to both the Connecticut Department of Labor and Thrall stating that fifty-one airline seats were reserved for workers bound for the Thrall farm on June 11 and June 12, 1991. The plaintiffs arrived in Connecticut on June 12, 1991 and were met at the airport by a Thrall representative. They were transported to the Thrall farm at Windsor Connecticut and commenced working on or about June 13, 1991 in accordance with their employment contract. They worked at the farm until July 19, 1991 when they were discharged. They returned to Puerto Rico and instituted a breach of contract action against Thrall in the Superior Court at Ponce, Puerto Rico. . . .
On July 13, 1992, the Puerto Rican Superior Court at Ponce rendered judgment for the plaintiffs under Rule 4.7 of the Puerto Rico Rules of Civil Procedure.[6] Thrall was properly served but did not appear. On July 13, 1992, the Superior Court at Ponce held that Thrall conducted business transactions in Puerto Rico and that it breached the clearance order and the farm labor contract existing between the parties.[7] Subsequently, the court awarded a default judgment in favor of the plaintiffs.[8] On September 7, 1993, the plaintiffs filed an application with this court seeking enforcement of this judgment under the full faith and credit clause . . . .
DISCUSSION The issue before this court is whether a Connecticut defendant engaged in the hiring of migrant farm workers pursuant to the Wagner-Peyser Act had sufficient minimum contacts with Puerto Rico so that the exercise of long arm jurisdiction over said defendant, which resulted in a default judgment, is not violative of due process, and whether the Superior Court of CT Page 4341 Puerto Rico properly exercised in personam jurisdiction over the defendants so that its default judgment should be given full faith and credit in Connecticut . . . .
The present case challenges the validity of a foreign state's default judgment on a resident corporation thereby implicating the full faith and credit clause of the United States Constitution. [Footnote omitted.] It is a case of first impression in the state of Connecticut.[11]". . . .
The plaintiffs submit that the Puerto Rican default judgment was a valid exercise of personal jurisdiction. They cite the decision of the Superior Court at Ponce which concluded as a matter of law that the defendant conducted business transactions in Puerto Rico. [Footnote omitted.] In Noon v. Calley and CurrierCo., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 521514 (March 13, 1995, Norko, J.), the court analyzed International Shoe [Co. v. State of Washington,326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)], and its progeny and applied the following test to determine jurisdiction: "[whether] the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state, and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies."
The threshold issue before this court in order to enforce the default judgment in question is whether Thrall had the requisite minimum contacts with Puerto Rico to validate the Commonwealth's jurisdiction to properly render the default judgment. "The full faith and credit clause does not automatically transform a foreign judgment into a valid judgment in this state . . . . in order for a foreign judgment to constitute a valid judgment, it must be made a judgment in this state." (Citations omitted.) Cahnv. Cahn, 26 Conn. App. 720, 730, 603 A.2d 759, cert. granted,221 Conn. 924 608 A.2d 688 (1992). Section 52-604 of the Uniform Enforcement of Foreign Judgment Act defines "foreign judgment" as: "any judgment, decree or order of a court of the United States or any other court which is entitled to full faith and CT Page 4342 credit in this state, except one obtained by default in appearanceor by confession of judgment." (Emphasis added.) "It can be made a judgment there only if the court purporting to render the original judgment had power to render such a judgment. A judgment in one state is conclusive upon the merits in every other State, but only if the court of the first State had power to pass on the merits — had jurisdiction, that is, to render judgment." Kruegerv. Krueger, supra. 491. "A court is without power to render a judgment if it lacks jurisdiction of the parties or of the subject matter, one or both. In such cases, the judgment is void, has no authority and may be impeached." Marshall v. Clark,170 Conn. 199, 205, 365 A.2d 1202 (1976).
Thrall raises three arguments in its trial brief for dismissal based on lack of personal jurisdiction. The first argument is that Thrall did not extend any offers of employment to the plaintiffs and therefore did not establish `minimum contacts' and is not liable under breach of contract theory. The second argument raised is that it granted no actual or apparent authority to the Yauco Department of Labor and therefore created no agency relationship upon which `minimum contacts' can be established. Finally, Thrall argues that it did not transact business and therefore did not have sufficient minimum contacts to establish in personam jurisdiction in Puerto Rico.
A. Clearance Orders As Offers of Employment
. . . In Rios v. Altamont Farms [Inc., 100 App.Div.2d 405,475 N.Y.S.2d 520 (N.Y.A.D. 1984) reversed and dissenting decision adopted in, 64 N.Y.2d 792, 476 N.E.2d 312, 486 N.Y.S.2d 913, cert. denied 473 U.S. 905 (1985)], the court defined a clearance order as "a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers." . . . InWestern Colorado Fruit Growers Association, Inc. v. Marshall
[473 F. Sup. 693 (D. Colo. 1979)], the court held that a "[p]laintiff's clearance order is essentially an offer for a contract of employment." Id., 696 . . . .
In Frederick County Fruit Growers Association v. McLaughlin,
[703 F. Sup. 1021 (D.D.C. 1989), 968 F.2d 1265, 296 U.S. App. D.C. 394 (D.C. Cir. 1992)] the court held that, "[t]he terms of a job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law . . . ." . . . . In27 Puerto Rican Migrant Farm Workers v. Shade Tobacco GrowersCT Page 4343Agricultural Association, Inc., supra, the court recognized the clearance order as a "breach of a simple employment contract." . . .
Thrall argues that "the consent of one party to a self-perceived but unknown and unintended `offer' of another party cannot be cognizable as a contract under the law of any jurisdiction . . . . Moreover, an offer must be made to a distinct party or number of parties, as controlled by the alleged offeror." (Citation omitted.) Trial Brief, p. 13. However, an examination of the clearance order at issue proves otherwise. Section 20 of the clearance order, submitted as Defendant's Exhibit A, entitled Employer's Certification, states "[t]his job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job." The signature of the Thrall's Vice President, Richard Bacon, appears beneath it. Appended to the order are attachments and which clearly lay out wage rates, pay periods, anticipated hours of work, housing, transportation, workers compensation, training, production standards and a termination clause. This court finds that the clearance order, signed and submitted by Thrall, constituted a unilateral contract containing an offer of employment. This court is persuaded by the holdings in Western Colorado Fruit Growers Association, Inc. v.Marshall, supra, and Frederick County Fruit Growers Associationv. McLaughlin, supra, which held that, "[t]he terms of a job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law." The clearance order was an offer to enter into a unilateral contract which could only be accepted by performance. Thus, the clearance order served as an invitation to the plaintiffs to enter into an employment contract with Thrall. The plaintiffs' manifestation of their intent to accept the offer was concluded upon their arrival in Connecticut. The defendant's argument that it "did not intend the Clearance Order to be a contractual offer that could be accepted by mere consent," Trial Brief, p. 13, is irrelevant. Once the plaintiffs arrived in Connecticut and began working, they manifested their intent to accept Thrall's offer beyond `mere consent.' . . .
B. Circulation of Clearance Orders Creating an Agency Relationship
Thrall argues that the Yauco DOL Office was not an agent of Thrall and was not authorized to act on Thrall's behalf. "In order to engage the Yauco Office as their hiring agent, CT Page 4344 Defendants would have had to take some action that could be construed as manifesting an intent to create an agency relationship." Trial Brief, p. 18.
Connecticut courts have determined that an agency relationship is created if, "(I) there is a manifestation by a principal that a person is acting for that principal, (2) there is acceptance by an agent of the relationship, and (3) there is an understanding that the principal is in control of the acts of the agent." State v. Smith, 40 Conn. App. 789, 799 (1996) . . . . To determine if the Wagner-Peyser Act creates an agency relationship, the court must review the legislative intent of the statute . . . .
"The Wagner-Peyser Act was passed in 1933 in order to deal with the massive problem of unemployment resulting from the Depression. The Act establishes the United States Employment Service within the Department of Labor `[i]n order to promote the establishment and maintenance of a national system of public employment offices.' 29 U.S.C. § 49. State agencies, which have been approved by the Secretary of Labor, are authorized to participate in the nationwide employment services. Id., § 49g. The Secretary is authorized to make `such rules and regulations as may be necessary' to accomplish the ends of the Act." Alfred L. Snapp Son, Inc. v. Puerto Rico, ex rel. Barez
[458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995, 29 Empl. Prac. Dec. P 32, 867 (1982)]. "The obvious point of this somewhat complicated statutory and regulatory framework is to provide assurances to United States workers, including the citizens of Puerto Rico. First, these workers are given a preference over foreign workers for jobs that becomes available within this country. Second, to the extent that foreign workers are brought in, the working conditions of domestic employees are not to be adversely affected, nor are United States workers to be discriminated against in favor of foreign workers." Id., 596.
This court is of the opinion that there was a manifestation by Thrall that the Yauco DOL was acting on its behalf in the recruitment of workers. On the face of its clearance order, Thrall asks the holding office to refer applicants to the holding office. [Footnote omitted.] The Yauco Office served as the delegated hiring authority. "The delegated hiring authority method is the method used by those employers who want the employment agencies to do the actual hiring of applicants instead of limiting their service to the usual referral of applicants, CT Page 4345 that is, the act of bringing to the attention of an employer an applicant or group of applicants who are available for specific job openings, 20 C.F.R. § 651.10 (1985), which is what the employment service system is designed to do and what, in fact, it generally does." Lopez-Rivas v. Donovan [629 F. Sup. 564 (D.P.R. 1986)]. In Garcia v. Vasauez, supra, the court held that a North Carolina employer who had no regular place of business or designated agent in Texas, "purposefully issued the job information in North Carolina [via the clearance order]. The [Texas Employment Commission] merely acted on his behalf in processing the information. The privilege of conducting activities in Texas was intentionally invoked by [the defendant]." . . .
Thrall used the interstate clearance system to recruit the plaintiffs and relied on the Yauco DOL as their `delegating authority' to process the applications and effectuate the employment arrangement. Consequently, the Yauco DOL was required by statute to enter this relationship . . . .
However, it is clear from the legislative history and relevant cases that the Yauco DOL, as an agent, was not under the control of the principal, Thrall . . . .
While the Yauco DOL considered Thrall's preferences during the employment search, "[e]mployers who utilize the system are required to offer certain minimum terms and conditions of work pursuant to DOL regulations. See generally 20 C.F.R. Part 653
(the "prevailing wage regulations"). The local office must ensure that the job offers comply with minimum terms and conditions of the DOL regulations. 20 C.F.R. § 653.501(c)." Morrison v.U.S. Dept. of Labor, 713 F. Sup. 664 (S.D.N.Y. 1989)], "Th[e] clearance order is reviewed by the state employment service and the regional offices of the DOL. In the case of agricultural workers, the order must meet the requirements of 20 C.F.R. § 602.9."Galindo v. Del Monte Corp., [382 F. Sup. 464 (N.D. 1974)]. Thus, the Yauco DOL was not under the control of the principal, Thrall. "An essential factor in an agency relationship is the right of the principal to direct and control the performance of the work by the agent." McLaughlin v. ChickenDelight, Inc., 164 Conn. 317, 322, 321 A.2d 456 (1973). Thus, a statutory agency relationship did not exist between Thrall and the Yauco DOL. However, while this court does not find that a statutory agency relationship was created, it does find that an implied agency was created. [Footnote omitted.] CT Page 4346
Even though the defendants never signed designations of hiring authority, no formal agency relationship is required in order to hold defendants responsible for the acts of others on their behalf which they initiated through their communications.Rios v. Altamont Farms, supra . . . . [T]his court finds that the circulation of the clearance order determined that an apparent or implied agency relationship existed.
C. Circulation of Clearance Orders Creating `Minimum Contacts'
The first prong of the International Shoe v. Washington,
supra, test for deciding whether a forum State can exercise extraterritorial in personam jurisdiction is whether there are sufficient `minimum contacts' between the defendant and the forum State. Thrall argues that it has "no corporate or other offices in Puerto Rico . . . never personally advertised for, recruited, or otherwise sought to employ Puerto Rican workers, either by acting from Connecticut or by entering the Commonwealth of Puerto Rico." Trial Brief, p. 11. Thrall further contends that it transact[ed] no business of any kind in Puerto Rico and has never personally availed [itself] of the Puerto Rican courts or government for any purpose." Id. While it concedes that it did file a clearance with the United States Department of Labor, it argues that it was required to do so in compliance with the H-2 Program and therefore did not purposefully avail itself of any services in Puerto Rico. Thrall further argues that "[t]his [was] not a voluntary act [and Thrall had] no control over the outcome of this act because they cannot control the distribution of or response to their Clearance Order." Id., 21-22. Thrall submits that since it neither voluntarily entered the `stream of commerce' nor controlled the distribution of its product, the clearance order, in any `purposeful manner,' it did not establish any minimum contacts in Puerto Rico. The plaintiffs argue that this case is factually similar to Rios v. Altamont Farms, supra, and should be decided on the same grounds.
In Rios, the court held that a New York commercial apple farmer who submitted clearance orders to local employment offices for interstate recruitment of workers made a business judgment to seek foreign labor and is therefore amenable to judgment under the laws of that forum. On facts similar to those before this court, the Rios court held that a Puerto Rican default judgment is entitled to full faith and credit under New York law. Relying on Judge Levine's dissent in the trial court, the Court of CT Page 4347 Appeals held that in order to determine whether a forum State can exercise extraterritorial in personam jurisdiction, the court must weigh "the totality of the foregoing facts and not selective elements thereof." The court found that, "there can be no question whatsoever that in filing the orders in local New York State employment offices, [the] defendants deliberately set in motion the job recruitment machinery of the interstate clearance system. Thus, [the] defendants did not merely acquiesce in the transmission of the clearance orders to other states and territories; each of them purposefully sent into the stream of interstate commerce a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers." Id., 415. The court determined that the facts of the case supported the conclusion that the defendants had a substantial connection to Puerto Rico, thereby satisfying the first prong of theInternational Shoe, test.
The facts of that case suggested that the defendants were aware that their clearance orders had reached and were being acted upon in Puerto Rico and that they received communications concerning the progress of recruitment. Further, the court found that the defendants reaped substantial benefits from the forum state. It found that certain activities "performed by Puerto Rican governmental authorities were exclusively for [the] defendants' benefit. The screening of laborers' health and police records can hardly be considered to have been in the interest of anyone but [the] defendants." Id., 415. The court held that transportation arrangements made by the Puerto Rican government on behalf of the defendants evinced conduct sufficient to satisfy the minimum contacts criteria of International Shoe. "For their own commercial self-interest, defendants elected to import migrant workers through the channels of interstate commerce. They further elected to take advantage of the expense-free hiring procedures of the interstate clearance system. These purposeful acts were undertaken with certain awareness that job offers would be disseminated and acted upon in Puerto Rico. They availed themselves of recruitment, screening and logistical services created under Puerto Rican laws and performed by Commonwealth employees. The conclusion is, therefore, inescapable that defendants purposefully and knowingly availed themselves of the benefits and protections established by Puerto Rican law." Id., 416.
The court further found that it was reasonable for the CT Page 4348 plaintiffs to bring suit in Puerto Rico as the "significant preliminary steps leading to [the] contract formation took place in Puerto Rico, including the performance of various conditions that defendants stipulated for in the clearance orders. These preliminary steps, including the making of commitments, obtaining medical and policy clearances, advancing the costs of air transport and actual embarkation, constituted either part performance or foreseeable detrimental action in reliance so as to have made defendants' offers irrevocable and legally binding before any plaintiff set foot in New York." Id.
The second prong to the International Shoe test requires the court to weigh the exercise of jurisdiction with traditional notions of fair play and substantial justice.
In Rios v. Altamont farms, supra, the court found that when "comparing the relative burdens of litigation in a foreign jurisdiction and assessing the forum State's interest in the litigation, it more aptly might be said that fair play and justice demand that plaintiffs be permitted validly to litigate their claims in their home forum." The court, considering the economic impact on both parties to proceed in the forum state, concluded that "[i]t may reasonably be assumed that the common defense to all of the claims asserted by these plaintiffs would basically entail testimony from a for discharging plaintiffs. Imposing the burden of producing such witnesses in Puerto Rico hardly amounts to a denial of due process, when a converse ruling effectively would confer total immunity from suit upon defendants." . . .
In the present case, it is undisputed that Thrall submitted its clearance order into the interstate clearance system under obligation of law. The law, as represented by the Wagner-Peyser Act, required that Thrall exhaust American employment resources before hiring foreign workers. In this context, Thrall was required to exhaust their employment search in the United States and her territories (Puerto Rico) prior to obtaining temporary visas for foreign workers. [Footnote omitted.] As perusal of the clearance order suggests, Thrall knew or should have known that its order would be circulated in Puerto Rico.[18] It engaged in business transactions with Puerto Rico in that it commissioned the Yauco DOL, through its clearance order, to recruit and screen applicants for the position. It was contacted by the Yauco DOL when this process was completed and was made aware of the plaintiffs intent to accept its unilateral offer of employment. CT Page 4349 Once these workers arrived in Connecticut, Thrall manifested its intention to fulfill its obligations under the contract when it transported these workers from Bradley Airport to its farm. Thrall knew or should have known that a contract for employment, which was circulated in Puerto Rico, used as a basis for recruitment in Puerto Rico and ultimately accepted in Puerto Rico by citizens of Puerto Rico, might be amenable to suit in Puerto Rico . . . .
In Hanson v. Denckla [357 U.S. 235, 253, 78 S.Ct. 1228,2 L.Ed.2d 1283 (1958)], supra, the court required a showing that the defendant availed itself of the privilege of conducting activities in the forum State. In this case, Thrall availed itself, through the clearance order, the privilege of recruiting and screening job applicants pursuant to the Wagner-Peyser Act. This court is further persuaded that `affiliating circumstances' exist to support this inference. Kulko v. California SuperiorCourt, [436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132, reh'g denied, 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978)]. The clearance order entered the `stream of commerce' as detailed inWorldwide Volkswagen Corp. v. Woodson [444 U.S. 286 (1980)]. The circulation of the clearance order with Thrall's additional conduct (request to Yauco to screen and recruit applicants) [Footnote omitted.] meets the requirements as outlined AsahiMetal Industry Co. v. Superior Court of California, [480 U.S. 102,107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)] . . . .
The second prong of the International Shoe test requires a showing that jurisdiction is consistent with traditional notions of fair play and substantial justice. This court is persuaded that Puerto Rico was the proper forum for the litigation of this dispute . . . .
. . . [I]n the present case, "[i]t may be reasonably assumed that the common defense to all of the claims asserted by these plaintiffs would basically entail testimony from a few supervisory employees concerning defendants' justification for discharging plaintiffs." Thrall argues that "[i]t is certainly inconvenient for Defendants to be hauled into a court some 2,000 miles away from their domicile, for a proceeding which is convened in a foreign language, and in a small town in what may appropriately be considered by them to be a foreign country. Moreover, this inconvenience applies equally to every single witness that could be called by Defendants to support the notion that Plaintiffs were wrongfully terminated, since every such CT Page 4350 witness would be a Thrall employee from Connecticut." Trial Brief, p. 24-25. As both parties must suffer the same inconveniences, as between the two, the Thrall corporation, rather than the migrant workers, is in the better position to bear this burden . . . .
. . . As the rendering of the default judgment in favor of the plaintiffs did not violate the defendants' right of due process, the judgment may be enforced in Connecticut under the doctrine of full faith and credit.
FREED, J.