411 S.E.2d 248

Julio SURRILLO, et al., Plaintiffs Below, Appellants,

v.

DRILAKE FARMS, INC., Defendant Below, Appellee.

William OCASIO, et al., Plaintiffs Below, Appellants,

v.

Irvin KING, et al., Defendants Below, Appellees.

Carmelo Rosairo VASQUEZ, Plaintiff Below, Appellant,

v.

Irvin KING, et al., Defendants Below, Appellees.

No. 20221.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 11, 1991.

Decided Nov. 1, 1991.

Garry G. Geffert, West Virginia Legal Services Plan, Inc., Martinsburg, for appellants.

William A. Johnston, Harrison & Johnston, Winchester, Charles F. Printz, Bowles, Rice, McDavid, Graff & Love, Martinsburg, for appellees.

PER CURIAM:

In this appeal, we are asked to determine whether the Circuit Court of Jefferson County was correct in holding that judgments obtained in Puerto Rico against the defendants below, Drilake Farms, Inc., a West Virginia corporation, and Irvin King, a resident of Jefferson County and officer of the aforementioned corporation, were unenforceable in this State. The defendants asserted that the Puerto Rican courts lacked personal jurisdiction over the defendants, thereby precluding enforcement of the judgments.

The material facts are undisputed. The defendants are apple growers. In 1978, they wanted to hire temporary foreign laborers to harvest their fall crop. The federal government, however, permits the hiring of such workers only if qualified citizens of the United States are not available for such employment. Accordingly, employers desiring to hire foreign labor must first file with the local employment office an application for temporary foreign labor certification and a statement of the terms and conditions of employment. If workers are not available locally, a clearance order, containing the terms and conditions of employment, is circulated to other employment offices throughout the state. If the job cannot be filled on the state level, the clearance order is distributed through the United States Department of Labor to employment offices in other areas of the nation. Permission to import temporary foreign labor is granted only if a sufficient number of domestic workers cannot be recruited through this process.[1]

On April 28, 1978, the defendants filed with the local employment office in Winchester, Virginia, an application to recruit 27 Jamaican laborers to work in their orchards for a two-month period in the fall. It does not appear that any workers were recruited on the local or state level, because on August 2, 1978, a clearance order containing the defendants' job offer was forwarded to Puerto Rico.[2] The Puerto Rican employment service set to work recruiting and screening applicants, obtaining the necessary documentation, and arranging for transportation to the defendants' job site.

By letter dated August 16, 1978, the Department of Labor advised the defendants that they would be allowed to recruit only eight Jamaican workers because nineteen Puerto Ricans were "available" to fill the jobs offered. On September 8, 1978, twenty-seven Puerto Rican workers, including the plaintiffs below, arrived in Winchester, Virginia. The defendants provided the plaintiffs with work, but fired them all within a few days.

The plaintiffs subsequently brought suit for damages in Puerto Rico, claiming that the defendants had breached their contracts of employment. Although the defendants were notified of the filing of the lawsuits, they made no personal appearance in the Puerto Rican courts, and default judgments were entered against them.

---

1. For a more detailed analysis of the interstate clearance system, as well as references to the appropriate statutes and regulations, see *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).

2. In April of 1978, Puerto Rican workers were considered "unavailable" for employment because Puerto Rico statutorily set minimum terms and conditions of employment higher than those required by the Department of Labor. *See Hernandez Flecha v. Quiros,* 567 F.2d 1154 (1st Cir.1977), *cert. denied,* 436 U.S. 945, 98 S.Ct. 2846, 56 L.Ed.2d 786 (1978). In July of 1978, however, legislation was enacted to allow exemptions from these requirements in certain circumstances. The defendants' clearance order was subsequently forwarded at the request of the Puerto Rican government.

On February 18, 1987, the plaintiffs instituted proceedings in the Circuit Court of Jefferson County to enforce the Puerto Rican judgments. Both sides moved for summary judgment. By order dated December 20, 1990, the circuit court ruled that the Puerto Rican courts did not have personal jurisdiction over the defendants and that the default judgments were, therefore, not enforceable in West Virginia. The plaintiffs appeal from the circuit court's decision granting summary judgment in favor of the defendants.

■■■ We start with the principles we recently restated in Syllabus Point 2 of *Gonzalez Perez v. Romney Orchards, Inc.*, 184 W.Va. 20, 399 S.E.2d 50 (1990):

> " 'Under Section 1, Article IV of the Constitution of the United States, the judgment or decree of a court of record of another state will be given full faith and credit in the courts of this State, unless it be clearly shown by pleading and proof that the court of such other state was without jurisdiction to render the same, or that it was procured through fraud.' Syllabus Point 1, *Johnson v. Huntington Moving & Storage, Inc.*, 160 W.Va. 796, 239 S.E.2d 128 (1977)." [3]

In Syllabus Point 4 of *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986), we stated:

> " ' "If the court, which rendered the judgment, was a court of general jurisdiction, the presumption is it had jurisdiction of the particular case, and to render the judgment void, this presumption must be overcome by proof.["] Syl. Pt. 3, *Gilchrist v. O. & O.L. Co.*, 21 W.Va. 115 (1882).' Syl. Pt. 2, *Fortner v. Fortner*, [168 W.Va. 70], 282 S.E.2d 48 (1981)."

The burden of establishing that the foreign court lacked jurisdiction rests upon the party attacking the judgment. *Lemley v. Barr, supra. See Cook v. Cook*, 342 U.S. 126, 72 S.Ct. 157, 96 L.Ed. 146 (1951).

■■ The defendants here assert that the Puerto Rican courts lacked jurisdiction of their persons. In Syllabus Points 1 and 2 of *Pries v. Watt*, 186 W.Va. 49, 410 S.E.2d 285 (1991), we stated:

> "1. The Due Process Clause of the Fourteenth Amendment to the United States Constitution operates to limit the jurisdiction of a state court to enter a judgment affecting the rights or interests of a nonresident defendant. This due process limitation requires a state court to have personal jurisdiction over the nonresident defendant.

> "2. In order to obtain personal jurisdiction over a nonresident defendant, reasonable notice of the suit must be given the defendant. There also must be a sufficient connection or minimum contacts between the defendant and the forum state so that it will be fair and just to require a defense to be mounted in the forum state."

*See Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The only issue in this case is whether the defendants had sufficient contacts with Puerto Rico to establish personal jurisdiction.

■■ In Syllabus Point 3 of *Pries*, we discussed the minimum contacts issue:

> "To what extent a nonresident defendant has minimum contacts with the forum state depends upon the facts of the individual case. One essential inquiry is whether the defendant has purposefully acted to obtain benefits or privileges in the forum state."

*See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In *Kulko v. Superior*

---

**3.** In *Gonzalez–Perez*, we stated: "Judgments from the courts of Puerto Rico are ... entitled to the same principles of full faith and credit as are judgments of the states under Article IV, Section 1 of the United States Constitution." 184 W.Va. at 24 n. 10, 399 S.E.2d at 54 n. 10.

*Court,* the Supreme Court noted that "the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." 436 U.S. at 92, 98 S.Ct. at 1697, 56 L.Ed.2d at 141, *quoting Hanson v. Denckla,* 357 U.S. at 246, 78 S.Ct. at 1235, 2 L.Ed.2d at 1293. Minimum contacts can be established even where the defendant has never physically entered the forum state. *See, e.g., McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

▇ The defendants assert that they had no contact whatsoever with Puerto Rico except the clearance order forwarded there by the Department of Labor. They state that they initiated the clearance order only because they were required by law to do so in order to hire foreign workers and maintain that the clearance order was forwarded to Puerto Rico without any request from them. The defendants also point out that they had no contact with or from anyone in Puerto Rico after the clearance order was forwarded there. They argue that these facts demonstrate that they did not purposefully avail themselves of the benefits available in the forum state so as to support the Puerto Rican courts' exercise of jurisdiction.

A similar argument was put forward in *Rios v. Altamont Farms, Inc.,* 100 A.D.2d 405, 475 N.Y.S.2d 520 (1984), *rev'd,* 64 N.Y.2d 792, 486 N.Y.S.2d 913, 476 N.E.2d 312, *cert. denied,* 473 U.S. 905, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985). The facts in *Rios* are virtually identical to those presented here: Puerto Rican migrant farm workers transported to New York for the 1978 apple harvest sought to enforce in New York default judgments entered in Puerto Rico against New York apple growers for breach of contract and tort claims. The Appellate Division found that the growers had no contact with Puerto Rico except the clearance orders which were forwarded to Puerto Rico at the direction of the Department of Labor and not at the request of the growers. The court also noted that when the growers initiated the

process, it was their intent to recruit foreign, not Puerto Rican, workers. For these reasons, the intermediate appellate court concluded that "the fortuitous nature of defendants' sole contact with Puerto Rico is insufficient to satisfy the requirements of due process." 100 A.D.2d at 410, 475 N.Y.S.2d at 524.

The Court of Appeals reversed, without further elaboration, "for reasons stated in the dissenting opinion by Justice ... Levine at the Appellate Division[.]" 64 N.Y.2d at 794, 486 N.Y.S.2d at 913, 476 N.E.2d at 312. That dissenting opinion challenged the majority's conclusion that because the growers had not overtly recruited or expressly requested that the clearance order be circulated in Puerto Rico, they did not purposefully act to obtain benefits there. Justice Levine found that by filing applications containing offers to contract and the terms and conditions of employment with the local employment office, the growers

> "deliberately set in motion the job recruitment machinery of the interstate clearance system. Thus, defendants did not merely acquiesce in the transmission of the clearance orders to other States and territories; each of them purposefully sent into the stream of interstate commerce a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers." 100 A.D.2d at 415, 475 N.Y.S.2d at 526.

The dissenting justice noted:

> "The offers to contract were physically delivered and distributed in Puerto Rico. Arguably, the offers were accepted there when plaintiffs made commitments to fill the harvesting positions, so that formation of the contracts was completed in Puerto Rico. At the least, significant preliminary steps leading to contract formation took place in Puerto Rico, including the performance of various conditions that defendants stipulated for in the clearance orders. These preliminary steps, including the making of commitments, obtaining medical and police clear-

ances, advancing the costs of air transport and actual embarkation, constituted either part performance or foreseeable detrimental action in reliance so as to have made defendants' offers irrevocable and legally binding before any plaintiff set foot in New York[.]" 100 A.D.2d at 416, 475 N.Y.S.2d at 527.

Justice Levine also noted that the growers were "well aware that their clearance orders reached Puerto Rico and were being acted upon there," as evidenced by "communications concerning the progress of recruitment." 100 A.D.2d at 415, 475 N.Y.S.2d at 526. The dissenting justice found that the recruitment and screening of workers, which took place in Puerto Rico, was undertaken for the benefit of the growers. Justice Levine concluded:

"For their own commercial self-interest, defendants elected to import migrant workers through the channels of interstate commerce. They further elected to take advantage of the expense-free hiring procedures of the interstate clearance system. These purposeful acts were undertaken with certain awareness that job offers would be disseminated and acted upon in Puerto Rico. They availed themselves of recruitment, screening and logistical services created under Puerto Rican laws and performed by Commonwealth employees. The conclusion is, therefore, inescapable that defendants purposefully and knowingly availed themselves of the benefits and protections established by Puerto Rican law." 100 A.D.2d at 416, 475 N.Y.S.2d at 527.

Much the same result was reached in *Garcia v. Vasquez*, 524 F.Supp. 40 (S.D.Tex.1981), where a North Carolina farmer initiated a clearance order seeking migrant farm workers to harvest cucumbers. The clearance order eventually reached the Texas Employment Commission (T.E.C.) where the plaintiffs learned of the offer. A number of workers responded, but when they arrived in North Carolina, they discovered that the wages, hours, and availability of housing were not as promised. The plaintiffs filed suit in Texas, and the North Carolina farmer raised the issue of personal jurisdiction under the Due Process Clause. The court rejected this argument stating:

"Due process requirements are also fulfilled. Defendant Keech purposefully issued the job information in North Carolina. The T.E.C. officials merely acted on his behalf in processing the information. The privilege of conducting activities in Texas was intentionally invoked by Keech. This cause of action plainly arises from and is connected with the alleged Texas transaction." 524 F.Supp. at 42.

In *Runnels v. TMSI Contractors, Inc.*, 764 F.2d 417 (5th Cir.1985), a Saudi Arabian limited partnership solicited the plaintiff, a Louisiana resident, to come to work for it in Saudi Arabia. The partnership had placed job advertisements in two Louisiana newspapers and its resident agent in California had mailed sample and actual contracts to the plaintiff at his home in Louisiana. The plaintiff took the job and worked in Saudi Arabia for over a year before he was fired. The plaintiff brought suit in Louisiana district court for wrongful discharge. In concluding that the Louisiana court had personal jurisdiction of the foreign partnership, the Fifth Circuit Court of Appeals stated:

"Because TMSI Arabia solicited Louisiana residents through local advertising and through its agent, because its contacts with Louisiana were deliberate rather than fortuitous, and because it could reasonably foresee that contract disputes would likely arise as a result of its solicitation of United States citizens, it is not unfair to require that TMSI Arabia defend this suit in Louisiana." 764 F.2d at 423.

Applying these principles to the case at bar, it seems clear that the defendants purposefully availed themselves of the Puerto Rican government's employment services in order to solicit workers at stated contract terms and that this solicitation resulted in Puerto Rican workers agreeing to the terms which were communicated to the defendants. Although the defendants desired to hire foreign workers, they were

aware that they were required by law to exhaust the pools of domestic labor. With this knowledge, they deliberately set in motion the hiring procedures of the interstate clearance system. Although they did not request that the clearance order be forwarded to Puerto Rico, they were apparently aware that it would go there if an insufficient number of workers were found in Virginia. Moreover, while the defendants initiated no direct contact with Puerto Rico, they apparently did have knowledge that recruiting was taking place there on their behalf through the local employment office. No later than mid-August, the defendants were advised that a number of Puerto Rican workers had been found to fill, at least in part, the jobs the defendants had available. The defendants did nothing to reject these workers or to discourage further recruiting. When the Puerto Rican workers arrived at the defendants' work site, the defendants even provided them with work for several days before firing them. Under these circumstances, we believe it was reasonably foreseeable that the defendants would be sued in Puerto Rico.

The defendants, however, argue that this case is controlled by the ruling in *Lopez–Rivas v. Donovan*, 629 F.Supp. 564 (D.Puerto Rico 1986), in which Puerto Rican farm workers who had responded to clearance orders like those of the defendants alleged that the growers' failure to transport them to the job site and provide them with work gave rise to a federal claim for damages. The district court concluded that

"absent a special form enabling the local employment agency to recruit, the mere placing of a job offer in the clearance system does not permit the employment agency to recruit workers for a particular job offer without consulting with the employer, giving information about the applicants and obtaining confirmation and acceptance from the employer." 629 F.Supp. at 568.

The defendants assert that this case demonstrates that they had no agency relationship with the Puerto Rican employment service which would establish sufficient minimum contacts with Puerto Rico to warrant the exercise of personal jurisdiction in the courts there. We note, however, that the question of personal jurisdiction did not arise in *Lopez–Rivas;* the only issue decided was whether the court had jurisdiction of the subject matter.[4]

The defendants also cite *Western Colorado Fruit Growers Association, Inc. v. Marshall*, 473 F.Supp. 693 (D.Colo.1979), wherein the government sued Colorado fruit growers for failure to transport and to employ domestic workers recruited pursuant to their clearance orders. The clearance orders specified that the job offer could be accepted only by the appearance of the workers at the specific location. The court concluded that since none of the workers complied with this condition of employment, there was no contractual relationship which would give rise to the cause of action pressed by the government. *See also Lopez–Rivas v. Donovan, supra.*

The defendants argue that because the plaintiffs here, like those in *Western Colorado Fruit Growers*, did not contact the employment office in Winchester to accept employment,[5] they have no contractual relationship which affords minimum contacts with Puerto Rico. We note, however, that in neither *Western Colorado Fruit Growers* nor *Lopez–Rivas* did the prospective workers actually appear at the prospective job site. In this case, the plaintiffs not

---

**4.** Although the growers in *Lopez–Rivas* did challenge the personal jurisdiction of the Puerto Rico district court, the court ruled: "Regardless of the validity of the defendants' ... personal jurisdiction ... arguments, the court considers the challenge to our subject matter jurisdiction as fundamental and dispositive of plaintiffs' claims[.]" 629 F.Supp. at 567.

**5.** The defendants' clearance order contained the following instructions for prospective job applicants: "Referral of crews and of individuals shall be made through the Winchester local office in order to ascertain current employment, crop, and housing information and to enable proper arrangements to be made." The form also stated that collect calls would be accepted at the Winchester office of the Virginia Employment Commission and included the office address, the name of the farm placement supervisor, and the telephone number.

only appeared, they also were transported to the job site and, after arriving, were actually provided with work by the defendants. Any technical defect in their manner of acceptance was clearly waived by the actions of the defendants.

The defendants also rely on *Chery v. Bowman*, 901 F.2d 1053 (11th Cir.1990), in which migrant farm workers from Florida sued a Virginia fruit grower for violation of federal statutes designed to protect such workers. The grower initiated recruitment procedures through the interstate clearance system, and his clearance order was transmitted to various states, including Florida. Meanwhile, the plaintiff, a Florida resident, drove to Virginia looking for work and learned of the grower's offer.from the local employment office. The grower subsequently hired the plaintiff with the understanding that he would bring about fifty men, recruited from Maryland and Florida, with him for harvest. After the plaintiff's crew had worked for several days, the grower fired a number of them. The plaintiff and other discharged workers filed a diversity action in federal district court in Florida, but the case was dismissed for lack of personal jurisdiction over the grower.

The Court of Appeals upheld the lower court, noting that "the Department of Labor's action [in forwarding the clearance order to Florida] does not constitute purposeful availment of the benefits of Florida law by [the grower]." 901 F.2d at 1056. The court in *Chery* refused to follow the New York court in *Rios*, recognizing that the two cases were clearly distinguishable factually: None of the plaintiffs in *Chery* had been hired as a result of the clearance orders being sent to Florida. As the court stated: "In *Rios*, unlike this case, the defendant apple growers received substantial benefits from the forum state's (Puerto Rico's) labor department in recruiting and processing the laborers who ultimately became the plaintiffs." 901 F.2d at 1057.

For the foregoing reasons, we conclude that the defendants have failed to overcome the presumption, arising under the Full Faith and Credit Clause under Section 1 of Article IV of the United States Constitution, that the Puerto Rican courts had jurisdiction to enter default judgments against them. Because the defendants did not clearly demonstrate that the Puerto Rican courts lacked personal jurisdiction over them, the circuit court erred in granting summary judgment in their favor. Accordingly, the judgment of the Circuit Court of Jefferson County is reversed, and the case is remanded to that court with instructions to enter summary judgment in favor of the plaintiffs below.

Reversed and remanded with instructions.

NEELY, J., dissents and reserves the right to file a dissenting opinion.

NEELY, Justice, dissenting:

I dissent on the grounds that the undisputed facts demonstrate conclusively that there were no contacts with Puerto Rico sufficient to justify jurisdiction under *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Complying with appropriate rules and regulations of the government of the United States does not constitute a "contact" with any other state or territory, and being "apparently aware" (*supra*, p. 111) does not constitute a jurisdiction-giving voluntary act.

While the majority pays lip service to the "minimum contacts" test by citing *International Shoe; Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), they effectively ignore U.S. Supreme Court precedent by quoting from a dissent by a New York *intermediate* level court (*supra*, pp. 109–110). The majority may cite *Asahi* and *World–Wide Volkswagen* as often as they like, and quote as many pages of Justice Levine's dissent as they like, but pages and pages of citations will make the majority no less wrong.