**Present: All the Justices**

**ORCHARD MANAGEMENT COMPANY, ET AL.**
                                        **OPINION BY**
**v. Record No. 950131**                              **CHIEF JUSTICE HARRY L. CARRICO**
                         **November 3, 1995**
**FERNANDO VARGES SOTO, ET AL.**

**FROM THE CIRCUIT COURT OF FREDERICK COUNTY**
**Lewis H. Griffith, Judge Designate**

In 1983, Fernando Varges Soto and thirty-two other Puerto Rican migrant farm workers (the Workers)[1] filed motions for judgment against Orchard Management Company and six other Virginia apple growers (the Growers),[2] seeking to have the trial court give full faith and credit to default judgments the Workers had secured against the Growers in the Superior Courts of Puerto Rico. Entered in 1979, the default judgments were based upon breach of employment contracts.

The trial court ordered consolidation of the thirty-three cases, and, on November 9, 1994, granted summary judgment in favor of the Workers in the amounts of the default judgments, ranging from $1,004.00 to $4,315.64. The Growers appeal.

---

[1] The thirty-two other farm workers are Jose A. Arrizagu, Saul Nieves Caban, Edwin Acevedo Caro, Rufino E. Carrasquillo, Jose R. Garcia Colon, Miguel Laboy Colon, Efrain A. Cordero, Antonio Eschevarrin, Porfirio R. Essparra, Catalino L. Feliciano, William D.V. Fonseca, Jose O. Hernandez, Jose O.P. Hernandez, Santiago Lebron, Jr., Guillermo Solo Lopez, Juan R. Mariani, Jose M. Perez Medina, Angel Perez Mendez, Augustin M. Pagan, Wilson Acevedo Perez, Luis A. Medina Ponce, Abigail B. Quinones, Carlos Flores Reyes, Angel M.F. Rivera, Benjamin R. Rodriguez, Edgardo N.R. Rodriguez, Juan Veya Ruiz, Carlos Santiago, Nelson Merc. Santiago, Ramon Hernandez Silva, Eddie Perez Vega, and Edy Perez Vega.

[2] The six other Virginia fruit growers are Stanley L. Bauserman, Henry Brumback and Woodbine Farm, Inc., Garland R. Cather, Philip Graize and Fred Land, Messick and Beaver, and Ray D. Rinker Estate.

The sole question for decision is whether the trial court erred in holding that the Puerto Rican courts acquired personal jurisdiction over the Growers pursuant to Puerto Rico's long-arm statute, entitling the default judgments to full faith and credit in Virginia.[3]  Finding that the trial court did not err, we will affirm.

The controversy involves the apple crop of 1978.  Needing additional labor to harvest the crop, the Growers, all operators of apple orchards in Virginia at the time, sought to import workers from abroad, as did growers from several other apple-producing states in the eastern part of the country.

Securing foreign workers involves a process developed through the interaction of two federal statutes, the Immigration and Nationality Act, 8 U.S.C. §§ 1101 through 1524 (1994), and the Wagner-Peyser Act, 29 U.S.C. §§ 49 through 49(I)-1 (1988 & Supp. 1993).  Under the Immigration and Nationality Act, an employer desiring to import aliens to perform temporary agricultural labor must file a petition, which may not be approved unless the employer has applied to the Secretary of Labor for a certification that there are not sufficient domestic workers "able, willing, and qualified, and who will be available at the time and place needed." 8 U.S.C. §§ 1184(c), 1188(a)(1)(A) (1994).

In making this determination, the Secretary of Labor relies upon the United States Employment Service, established within the Department of Labor pursuant to the Wagner-Peyser Act.  29 U.S.C. § 49 (1988).  The Employment Service operates an intrastate and interstate clearance system, composed of both federal and state employment service offices, to provide employers a means of recruiting nonlocal

---

[3]In pertinent part, Puerto Rico's long-arm statute permits its courts to take jurisdiction over a person "if the action or claim arises because said person . . . [t]ransacted business in Puerto Rico personally or through an agent."  P.R. Laws Ann. tit. 32, App. III Rule 4.7(a) (1983).

workers when the supply of local workers is inadequate. As the Workers note on brief, it is undisputed that "Puerto Rico is treated as a State under the Wagner-Peyser system" and that "Puerto Rican citizens are American citizens and are considered part of the domestic work force."

An employer desiring to import temporary foreign workers must first seek domestic workers through the intrastate and interstate clearance system. 20 C.F.R. § 655.201(c) (1978).[4] The employer must file a temporary labor certification application with the local office of the state employment service agency, together with a job offer, which details the terms and conditions of employment. 20 C.F.R. §§ 655.200(a), 655.202 (1978).[5] Upon receipt of the application, the local employment office attempts to recruit workers in the local labor market and mails a duplicate application to the Department of Labor regional office, which determines whether the job offer complies with federal regulations. 20 C.F.R. § 655.204(a)-(e) (1978).

If recruitment of local workers is unsuccessful, the local employment office places the job offer in the intrastate system for recruitment throughout the particular state. 20 C.F.R. §§ 653.108(c)(7), 655.205(a) (1978). If the statewide system

---

[4]Although the regulations governing the importation of temporary foreign workers have remained substantially unchanged, the regulations in effect at the time of the 1978 apple harvest are cited in this opinion.

[5]As part of a temporary labor certification application, an employer must include a number of assurances, ranging from an assurance that the job opportunity is open to all qualified domestic workers and that no domestic worker will be rejected for other than a lawful job-related reason, 20 C.F.R. § 655.203(c) (1978), to an assurance that from the time foreign workers depart for the employer's place of employment, the employer will provide employment to any qualified domestic worker who applies to the employer until fifty per cent of the period of the work contract has elapsed, 20 C.F.R. § 655.203(e) (1978).

produces no results, the state employment service agency places the job offer in the interstate system for circulation to areas of the country determined by the Department of Labor regional office to be potential sources of domestic workers. 20 C.F.R. §§ 653.108(d)(3), 655.205(a) (1978).

Only if this circulation fails to produce a supply of workers is the employer permitted to import temporary foreign labor. 20 C.F.R. § 655.206(a) (1978). If the Department denies the temporary labor certification, it must notify the employer in writing and by telegram. 20 C.F.R. § 655.206(c) (1978).

According to a stipulation of facts filed in the court below, each of the Growers, on April 23, 1978, submitted a "Clearance Order - Rural Manpower Job Offer" to the local office of the Virginia Employment Commission in Winchester, Virginia. In Box 18, under a printed heading styled "Distribution of Clearance Order," Region II was listed, which includes Puerto Rico. The "Period of Employment" was shown as running from September 5, 1978, to October 27, 1978.

At the time the Growers submitted their clearance orders to the Winchester office of the Employment Commission, Puerto Rico was not eligible to participate in the federal employment system created under the Wagner-Peyser Act because of the enactment by the Puerto Rican legislature of Public Law 87 of 1962, as amended in 1977. This law forbade the Puerto Rican Secretary of Labor from contracting with the United States "to release Puerto Rican residents for itinerant work except upon conditions . . . more onerous to the employer than those set by the U.S. Secretary." Flecha v. Quiros, 567 F.2d 1154, 1155 (1st Cir. 1977), cert. denied, 436 U.S. 945 (1978). As a result, the United States Secretary of Labor properly ruled that no Puerto Rican workers were "'available'" within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14)(A), when determining "the need for temporary foreign workers." Id. at 1155, 1157.

On July 13, 1978, the Puerto Rican legislature amended Public Law 87. The

amendment authorized the Puerto Rican Secretary of Labor to exempt prospective employers from the strictures of Public Law 87 under certain circumstances.

When the local and statewide recruiting efforts undertaken by the employment service on behalf of the Growers proved unsuccessful, their clearance orders were forwarded to the United States Department of Labor. Then, on August 2, 1978, following enactment of the amendment to Public Law 87 and at the request of the Puerto Rican Secretary of Labor, the United States Department of Labor forwarded the Growers' clearance orders to Puerto Rico, and the Puerto Rican Department of Labor recruited workers in response to the Growers' clearance orders.

Late in August 1978, the Growers were informed that their requests for certification to import temporary foreign labor were being denied in part because a number of Puerto Ricans had accepted their clearance orders. Each of the Growers was also furnished a "manifest list" containing the names of the Puerto Rican workers who had accepted the Growers' clearance orders. According to the stipulation of facts filed in this case, "[a]t no time did the [Growers] withdraw their respective Clearance Orders."

On August 31, 1978, before the harvesting of apples began, several associations of growers in Virginia, New York, West Virginia, and Maryland, including the Frederick County Fruit Growers Association, Inc. (numbering among its members all but one of the Virginia growers involved in the present case), filed suit in the United States District Court for the Western District of Virginia. Frederick County Fruit Growers Ass'n, Inc. v. Marshall, No. 78-0086(H) (W.D. Va., August 31, 1978), appeal dismissed and remanded, 594 F.2d 857 (4th Cir. 1979). The suit sought a mandatory injunction against the United States Secretary of Labor, the Commissioner of the Immigration and Naturalization Service, and their subordinates, to permit the apple growers to recruit and employ foreign workers.

Puerto Rico was permitted to intervene to represent the interests of its residents.

The District Court issued a preliminary injunction ordering that a certain number of foreign workers be allowed to enter this country to harvest apples. As a result of the injunction order, a number of Jamaicans gained entry. This prompted Puerto Rico to file a complaint in the United States District Court for the Western District of Virginia against individuals and companies engaged in the Virginia apple industry, including all but one of the apple growers involved in this appeal. Commonwealth of Puerto Rico v. Alfred L. Snapp & Son, Inc., 469 F. Supp. 928 (W.D. Va. 1979). The theory of the complaint was that the apple growers were discriminating against Puerto Rican workers in favor of Jamaican workers in violation of the Wagner-Peyser Act.

The case ultimately reached the Supreme Court of the United States. Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592 (1982). Of particular interest here, both the District Court and the Supreme Court opinions recite that prior to issuance of the injunction in Frederick County Fruit Growers Ass'n, Inc. v. Marshall, permitting entry of the Jamaican workers into this country, the apple growers assured the District Court that they recognized their obligation to give priority to Puerto Rican workers, notwithstanding the injunction order. 469 F. Supp. at 930, 458 U.S. at 598 n.5.

The Puerto Rican workers involved in this appeal arrived by bus in the Winchester area in early September 1978. The experience of Fernando Varges Soto, the lead appellee here, is typical of what happened to the Puerto Rican workers upon their arrival; he was allowed to work only one day before being dismissed. The Workers then instituted in the Puerto Rican courts the breach of contract actions that resulted in the default judgments in issue here.

As indicated previously, the basic question is whether the default judgments are entitled to full faith and credit in Virginia. "The Full Faith and Credit Clause of

the Constitution of the United States requires that '[a] judgment entered in one State must be respected in another provided that the first State had jurisdiction over the parties and the subject matter.'" Bloodworth v. Ellis, 221 Va. 18, 21, 267 S.E.2d 96, 98 (1980) (quoting Nevada v. Hall, 440 U.S. 410, 421 (1979)).  The Growers contend that the Puerto Rican courts lacked in personam jurisdiction over the Growers and that the trial court erred in holding the default judgments were entitled to full faith and credit in Virginia.

The Growers complain that the trial court provided no reasoning for its holding, except to state that it was "relying on the decisions cited by [the Workers]," namely, Rios v. Altamont Farms, Inc., 476 N.E.2d 312 (N.Y.), cert. denied, 473 U.S. 905 (1985), and Surrillo v. Drilake Farms, Inc., 411 S.E.2d 248 (W.Va. 1991), cert. denied, ___ U.S. ___, 113 S.Ct. 54 (1992).  The Growers argue that Rios and Surrillo "assault the decisions of the U. S. Supreme Court which have defined the standards for assertion of in personam jurisdiction consistent with the due process requirements of the United States Constitution."

Due process requires that "in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  "[A]n essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in [the forum] State."  Kulko v. California Superior Court, 436 U.S. 84, 92 (1978).

In determining whether the quality and nature of a defendant's activity make it reasonable and fair to require him to conduct his defense in the forum state, "it is essential in each case that there be some act by which the defendant purposefully

avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). It is sufficient if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). And the minimum contact requirement is more readily satisfied when, as here, "the litigation results from alleged injuries that 'arise out of or relate to'" a defendant's contacts with the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).

These principles were considered by the respective courts in Rios and Surrillo. Rios is especially interesting and instructive. The New York Supreme Court, the state's court of general jurisdiction, awarded summary judgment in favor of the Puerto Rican workers, holding that Puerto Rico properly asserted jurisdiction over the New York apple growers in entering the default judgments. Rios v. Altamont Farms, Inc., 459 N.Y.S.2d 386 (N.Y. Sup. Ct. 1983). The Appellate Division of the Supreme Court reversed, ruling that the apple growers had no contact with Puerto Rico other than the forwarding of their clearance orders to Puerto Rico at the direction of the United States Department of Labor and that such contact was "insufficient to enable the Puerto Rican courts to assert jurisdiction consistent with the due process clause." Rios v. Altamont Farms, Inc., 475 N.Y.S.2d 520, 523 (N.Y. App. Div. 1984).

Justice Levine of the Appellate Division dissented. After reviewing the facts and the authorities, he noted that the International Shoe Co. test is composed of two parts, each independently significant, (1) the minimum contacts element, and (2) the fair play and substantial justice element. Rios, 475 N.Y.S.2d at 525. He then said:
Measured by all of the foregoing criteria, I have no difficulty in

finding that defendants' activities constituted sufficient minimum contacts with Puerto Rico to subject them to breach of contract suits there, completely consistent with fair play and substantial justice.

Id. at 526.

The Supreme Court's judgment was appealed to the Court of Appeals of New York. That court, in a six-line opinion, reversed the judgment of the Appellate Division and reinstated the judgment of the trial court in favor of the Puerto Rican workers "for reasons stated in the dissenting opinion by Justice Howard A. Levine at the Appellate Division." Rios v. Altamont Farms, Inc., 476 N.E.2d 312, 312 (1985).[6]

In Surrillo, the trial court awarded summary judgment in favor of the apple growers. The Supreme Court of Appeals of West Virginia cited Rios in reversing and ordering the award of summary judgment in favor of the Puerto Rican workers. 411 S.E.2d at 255.

When the apple growers petitioned the Supreme Court of the United States for certiorari in Surrillo, the Court invited the Solicitor General to express the views of the United States. In an amicus curiae brief, the Solicitor General disagreed with an assertion of the apple growers that the West Virginia court had shifted the focus from the conduct of the apple growers to the conduct of the Puerto Rican workers and others. Instead, the Solicitor General pointed out, the West Virginia court "properly looked to the conduct of [the apple growers] themselves in determining

_____

[6]The Circuit Court for Washington County, Maryland, followed Rios in finding that the activities of the Maryland apple growers "constituted minimum contacts with Puerto Rico such that [the Puerto Rican workers'] lawsuits do not offend notions of fair play and substantial justice." Gregory-Ayala v. Rinehart Orchards, Inc. (Circuit Court for Washington County, Md., Jan. 23, 1986). The Court of Appeals of Maryland denied certiorari. 507 A.2d 631 (Md. 1986).

whether the requirements of the Due Process Clause had been satisfied."[7]

The Solicitor General concluded that the West Virginia decision "amounts to nothing more than a fact-bound application of settled law" and that "further review is unnecessary." Apparently, the Supreme Court agreed with the Solicitor General because certiorari was denied. ___ U.S. ___, 113 S.Ct. 54.

The Growers make a vigorous attempt to distinguish the present case from Rios and Surrillo. The Growers state that because Surrillo "embraced and cited virtually every facet of Justice Levine's (dissenting) opinion," a "critique of [that] opinion applies to both."

First, the Growers say that Justice Levine found that when the New York growers signed the clearance orders involved in Rios, Box 18 had already been filled in, with Region II, which includes Puerto Rico, listed for distribution of the orders. "Not so in Virginia," the Growers assert. They maintain that, according to practice, Box 18 is not filled in by Virginia growers at the time of filing the clearance orders but by the Department of Labor at a later time. However, in this case, as the Workers point out, a clearance order prepared in the name of one of the Growers is reproduced in the appendix. When reproduced, the order had not been signed by the Grower, but Box 18 had already been filled in, with Region II listed as one of the targets for distribution of the order.

---

[7]The Growers make the argument here that the Rios and Surrillo courts "abandoned a focus on the activities of the Growers and focused instead on the activities of others (i.e., the Puerto Rican employment office) to establish the nexus between the Growers and the forum state of Puerto Rico." We agree with the Solicitor General's statement that the Surrillo court did not change the focus, and we think the same statement can be made about the Rios court. The effects that the Growers' activities had in Puerto Rico are relevant to the question whether the two-part test of International Shoe Co. has been satisfied, especially the "traditional notions of fair play and substantial justice" prong of the test.

Next, the Growers say that Justice Levine found that the New York record "'incontestably established'" the New York growers were aware their clearance orders were delivered to Puerto Rico in August 1978, before the apple harvest began. "Not so in Virginia," the Growers assert. Yet, the Growers admit elsewhere in their brief that "[l]ate in August [1978]," before the apple harvest began, "the Virginia Growers were informed that their requests for temporary labor certification were being denied in part because a number of Puerto Ricans had accepted their Clearance Orders." It is difficult to imagine how the Growers could be informed late in August 1978 that their requests for certification were being denied because a number of Puerto Ricans had accepted their clearance orders if the orders had not been delivered to Puerto Rico earlier that month.

Furthermore, through their growers association, most of the Growers participated in the federal court suit, filed on August 31, 1978, in which they obtained a mandatory injunction compelling permission to hire foreign workers. There, the assurance was made that, notwithstanding the injunction order, priority would still be given to available Puerto Rican workers, who obviously were recruited as a result of the efforts undertaken in Puerto Rico after receipt of the Growers' clearance orders. In face of the admission in their brief and the assurance given in the federal suit filed on August 31, 1978, the Growers will not be heard to say they were unaware their clearance orders were delivered to Puerto Rico in August 1978.

Continuing, the Growers state that Justice Levine in Rios attached importance to the assurance given in the federal suit. The Growers maintain the "assurance added nothing to the requirements of the law," pointing out that 20 C.F.R. § 655.203(e), see supra note 5, requires an employer, as part of a temporary labor certification application, to include an assurance that from the time foreign workers depart for the employer's place of business, he will provide employment to any qualified domestic worker until fifty per cent of the period of the work contract

has elapsed.

It is no doubt true that the assurance the apple growers made in the federal suit "added nothing to the requirements of the law," but it added significantly to "the totality of the . . . facts" upon which Justice Levine stated that "the due process issue," involving the elements of "'minimum contacts'" and "'traditional notions of fair play and substantial justice,'" must be determined. Rios, 475 N.Y.S.2d at 525. And it is solid refutation of the Growers' assertion on brief that their "level of contact . . . with Puerto Rico . . . begins and ends with [their] filing of the . . . Job Clearance Orders in the Winchester office of the Virginia Employment Service on April 23, 1978."[8]

Further, the Growers say Justice Levine found that the activities of the Puerto Rican Labor Department benefitted the New York growers. "In Virginia," the Growers respond, "Puerto Rico totally failed to communicate any of its activities to the Virginia Growers." This response not only fails to distinguish Rios, it also misses the point; the fact that Puerto Rico may have failed to notify the Growers of

---

[8]The Growers argue that "the Job Clearance Order specified the exclusive method of acceptance [of employment by a prospective worker,] which was to contact the Winchester office of the Virginia Employment Service." All the clearance order states, however, is that the "[r]eferral of crews and of individuals shall be made through the Winchester local office . . . in order to ascertain current employment, crop, and housing information and to enable proper arrangements to be made." (Emphasis added.) We fail to see how a provision for the referral of people to an office to ascertain information and to make "proper arrangements" can be read as specifying the exclusive method of accepting employment. In any event, the Growers' argument relates to the question whether contracts came into existence between the Growers and the Workers, and that question is not involved in this appeal. We are concerned solely with the question whether the Growers had sufficient minimum contacts with Puerto Rico to give its courts in personam jurisdiction over the Growers, not whether those contacts ripened into valid contracts.

its activities does not mean the activities did not benefit the Growers.

The Growers' response also overlooks the fact that when the Puerto Rican Labor Department recruited Puerto Ricans to work in New York, it also recruited Puerto Ricans to work "elsewhere," Rios, 475 N.Y.S.2d at 525, meaning in Virginia, West Virginia, and Maryland, and that what the Labor Department did of benefit to New York, it did for Virginia, West Virginia, and Maryland as well. This included screening applicants, requiring applicants to obtain certificates of good health and lack of a criminal record, and expediting workers' embarkation by plane to the United States. Id.

Finally, the Growers say that Justice Levine found that during the recruitment process, the New York growers were advised of the numbers and names of workers they should expect to arrive. "Not so in Virginia," the Growers assert, and they cite in support of this assertion paragraphs 16 and 17 of the stipulation of facts filed in this case. However, neither paragraph deals with advice to the Growers. Paragraph 16 states that "[p]rior to the arrival of [the Workers] in Virginia," the Puerto Rican Secretary of Labor "sent a TWX to the Regional Administrator of the Employment and Training Administration in Philadelphia, Pennsylvania listing the names of Puerto Rican workers who had accepted the Clearance Orders of particular Virginia apple growers." Paragraph 17 details the different categories into which the workers happened to fall. So neither paragraph appears to have any relevance whatsoever to the point of distinction the Growers attempt to make between this case and Rios.

In our opinion, there is no principled difference between the present case on the one hand and Rios and Surrillo on the other. And we agree with the reasons Justice Levine assigned in Rios for finding that Puerto Rico had in personam jurisdiction over the Growers:

> The activities defendants . . . engendered were more than

sufficient to satisfy the basic minimum contacts criteria of International Shoe Co. . . . These purposeful acts were undertaken with certain awareness that job offers would be disseminated and acted upon in Puerto Rico. They availed themselves of recruitment, screening and logistical services created under Puerto Rican laws and performed by [Puerto Rican] employees. The conclusion is, therefore, inescapable that defendants purposefully and knowingly availed themselves of the benefits and protections established by Puerto Rican law.

475 N.Y.S.2d at 527.[9]

[The] case for valid jurisdiction is even more easily made when it is considered in terms of its consistency with traditional notions of fair play and substantial justice, the balance of the International Shoe Co. test. Indeed, on the basis of comparing the relative burdens of litigation in a foreign jurisdiction and assessing the forum State's interest in the litigation, it more aptly might be said that fair play and justice demand that [the Puerto Rican workers] be permitted validly to litigate their claims in their home forum.

Id. at 528.

We also agree with the reasons the Supreme Court of Appeals of West Virginia assigned in Surrillo for finding that the Puerto Rican courts had in personam jurisdiction over the Growers:

[I]t seems clear that the defendants purposefully availed themselves of the Puerto Rican government's employment services in order to solicit workers at stated contract terms. . . . No later than mid-August, the defendants were advised that a number of Puerto Rican workers had been found to fill, at least in part, the jobs the defendants had available. The defendants did nothing to reject these workers or to discourage further recruiting. When the Puerto Rican workers arrived at the

---

[9] Justice Levine also said that his conclusion could not "be avoided by stressing that defendants never signed designations of hiring authority." 475 N.Y.S.2d at 527. Here, the Growers argue that "the regulations specifically provide that an agricultural employer may designate either the U. S. Department of Labor or, in this case, the Puerto Rico Department of Labor and Human Resources to act as agent for the purposes of hiring," but that "[t]his was not done in this case." However, this argument relates to the question whether contracts came into existence between the Growers and the Puerto Rican workers, and, as indicated in note 8, supra, that question is not involved in this appeal.

defendants' work site, the defendants even provided them with work for several days before firing them. Under these circumstances, we believe it was reasonably foreseeable that the defendants would be sued in Puerto Rico.

411 S.E.2d at 253-54.

Here, consonant with Hanson v. Denckla, there existed an "act by which [the Growers] purposefully avail[ed themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," 357 U.S. at 253; consonant with World-Wide Volkswagen Corp. v. Woodson, the Growers' "conduct and connection with the forum State [were] such that [they] should reasonably [have] anticipate[d] being haled into court there," 444 U.S. at 297; and consonant with Burger King Corp. v. Rudzewicz, "the litigation results from alleged injuries that 'arise out of or relate to'" the Growers' contacts with the forum state, 471 U.S. at 472. Hence, consonant with International Shoe Co. v. Washington, the Growers had "certain minimum contacts with [Puerto Rico] such that the maintenance of the [Workers' suits] does not offend 'traditional notions of fair play and substantial justice,'" 326 U.S. at 316.

Lopez-Rivas v. Donovan, 629 F. Supp. 564 (D.P.R. 1986), and Chery v. Bowman, 901 F.2d 1053 (11th Cir. 1990), cited by the Growers, are inapposite. Lopez-Rivas was decided solely upon the ground that the court lacked subject matter jurisdiction. 629 F. Supp. at 567. In Chery, in personam jurisdiction in a Florida court was denied because the hirings occurred not as a result of the distribution of clearance orders in Florida but as a result of direct contact between the defendant and the employees in Virginia. 901 F.2d at 1056.

When full faith and credit is sought for a judgment rendered by a court of general jurisdiction of another state, that court's jurisdiction over the cause and the parties is presumed unless disproved by extrinsic evidence or the record itself, Adam v. Saenger, 303 U.S. 59, 62 (1938), and the burden is upon the party

challenging the judgment to establish the lack of jurisdiction, <u>Bloodworth v. Ellis</u>, 221 Va. at 24, 267 S.E.2d at 100. Here, the record itself does not disprove jurisdiction of the Puerto Rican courts, and the Growers have failed to carry their burden of establishing the lack of jurisdiction by extrinsic evidence. Accordingly, the presumption prevails, and we will affirm the judgment of the trial court, giving full faith and credit to the Puerto Rican default judgments.

<u>**Affirmed**</u>.